IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:17-CV-167-D

| | | |
|---|---|---|
| DANIEL R CARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendant. | ) | |

On February 22, 2018, Daniel R. Carr ("Carr" or "plaintiff") filed a first amended complaint against the United States of America, Wilbur L. Ross, Jr. ("Ross"), Bernard W. Gottholm ("Gottholm"), James L. Guyton ("Guyton"), Aleta A. Hohn ("Hohn") (collectively "the government"), and Jardon & Howard Technologies, Inc., d/b/a JHT, Incorporated ("JHT") [D.E. 13]. Carr seeks damages under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), from the United States, Ross, Gottholm, Guyton, and Hohn. Carr seeks damages from JHT for wrongful discharge. On March 8, 2018, JHT moved to partially dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction [D.E. 16] and filed a memorandum in support [D.E. 17]. On March 26, 2018, the government moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim [D.E. 21] and filed a memorandum in support [D.E. 22]. Carr responded in opposition to both motions [D.E. 23, 24]. On April 30, 2018, the government replied [D.E. 26].[1] As explained below, the court grants the government's motion to dismiss, and grants in

---

[1] On June 11, 2018, the court granted Carr's motion to dismiss his tortious interference claim against all defendants. See [D.E. 29].

part and denies in part JHT's motion to dismiss.

I.

From 2003 to December 8, 2014, Carr worked as a laboratory biologist at the National Oceanic and Atmospheric Administration ("NOAA") facility on Pivers Island in Beaufort, North Carolina. See Compl. [D.E. 13] ¶ 10. NOAA is a division of the United States Department of Commerce. Since 2003, NOAA has used contractors to provide some laboratory staffing at its Pivers Island facility. Id. ¶ 11. Alpha Solutions, a federal contractor working with NOAA, initially hired Carr. Id. ¶ 12. In 2007, NOAA awarded a contract to JHT to provide laboratory staffing at its Pivers Island facility. Id. ¶ 13. From 2007 until December 2014, JHT employed Carr. See id. Carr's title was "Biologist II," and he worked as a research technician. Id.

NOAA provided an occupational safety program for all personnel working at its Pivers Island facility. See id. ¶ 19. NOAA's safety program included safety training sessions and a safety officer. See id. JHT did not have its own safety program and deferred to NOAA's safety program. See id. Carr attended the occupational safety training sessions that NOAA conducted. See id. ¶ 20. As part of the safety training sessions, NOAA directed personnel to report concerns about occupational health and safety. See id. On September 26, 2008, Carr signed an employee acknowledgment form that stated "[y]ou are encouraged to report any unsafe work practices or safety hazards encountered on the job." Id. ¶ 16.

In June 2014, the NOAA safety officer who worked at the Pivers Island facility left and was not replaced. See id. ¶ 21. In December 2014, Carr learned that management decided to move a harmful algae bloom laboratory, which was located outside of Carr's building, to a new space located on Carr's hallway. See id. ¶ 22. Carr became concerned with this decision and believed that no safety officer would have approved the move because Carr's hallway was equipped with an AEON

2

unit, a type of ventilation system, which could quickly distribute airborne toxins from the harmful algae blooms through his floor. See id. ¶¶ 22–23. On December 4, 2014, Carr e-mailed his NOAA team leader, Jennifer Potts, and informed Potts of his safety concerns regarding the harmful algae bloom laboratory being moved to his hallway. See id. ¶ 25. On the same day, Potts forwarded Carr's e-mail to the NOAA Chief of the Sustainable Fisheries Branch at Pivers Island and noted that Carr's "concern for HABs [harmful algae blooms] becoming airborne is not without merit." Id. ¶ 27. On December 5, 2014, James Guyton, the deputy director of NOAA's laboratory at Pivers Island, e-mailed Carr and told Carr to inform his JHT program manager about his work related concerns. Id. ¶ 28. Guyton also sent a copy of that e-mail and Carr's December 4 e-mail to Ann Skradski who was responsible for coordinating JHT's employees at the Pivers Island facility. Id. ¶ 29. On the same day, Skradski e-mailed Carr and wrote

> I have your concerns for action. I will be communicating with NOAA to gather additional information related to your concerns. I know safety to be of top concern for NOAA, as it is for JHT. Once I have the appropriate information, I will be back in touch to set up a time in which we can discuss.

Id. ¶ 31.

Sometime between December 4, 2014, and December 8, 2014, an employee from NOAA directed JHT to terminate Carr's employment. See id. ¶ 32.[2] On December 8, 2014, Skradski told Carr that his December 4 e-mail expressing safety concerns regarding the relocation of the harmful algae laboratory to his floor was inappropriate and terminated his employment. Id. ¶¶ 37–38. When Carr was terminated, he was not "under any investigation by either JHT or NOAA regarding his

---

[2] Carr alleges that "Gottholm, Guyton and Hohn and, as their employer under the doctrine of respondeat superior, the United States of America, ordered Defendant JHT, to remove [Carr] from his job[.]" Id. Gotthom, Guyton, and Hohn are NOAA employees and hold management positions at NOAA's laboratory at Pivers Island. See id. ¶¶ 3–5.

3

personal conduct or his job performance and no adverse job actions were pending." Id. ¶ 49. The NOAA Chief of Sustainable Fisheries Branch at Pivers Island e-mailed Hohn and told her that

> I think the firing was a gross error in judgment. In fact, it was such a gross error in judgment that I feel compelled to report this to the NOAA IG as a violation of the Whistleblower Protection Act. Dan appears to have been fired immediately after sending an email about safety concerns at the lab. I am no lawyer, but how this cannot be viewed as retaliatory is beyond my reckoning. Ann [Ann Skradski – a JHT official] herself admitted that the firing was not within JHT's normal process for firing and it was done in reaction to the email forwarded by Jim Guyton to her.

Id. ¶ 41.

On January 23, 2015, Carr filed a complaint with the North Carolina Department of Labor under the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. §§ 95-240, et seq., for unlawful and retaliatory discharge. Id. ¶ 56. On October 23, 2015, the North Carolina Department of Labor informed Carr that the federal Occupational Safety and Health Administration is handling the matter. Id. ¶ 57. The North Carolina Department of Labor did not issue Carr a right-to-sue letter, which is a prerequisite to bringing a REDA claim. Id. ¶ 59.

The United States Department of Labor accepted the North Carolina Department of Labor's referral of Carr's claims against JHT. See id. ¶ 63. On February 2, 2018, the United States Department of Labor sued JHT and Ann Skradski alleging that JHT and Skradski unlawfully discriminated against Carr in violation of section 11(c)(1) of the Occupational Safety and Health Act ("OSHA"). See Acosta v. Jardon & Howard Techs., Inc., No. 4:18-CV-16-D, [D.E. 15] (E.D.N.C. Feb. 2, 2018). The Department of Labor, on behalf of Carr, seeks reinstatement to a comparable position, back pay and benefits plus interest, punitive damages, and other relief. See id. ¶ 18. Carr also has a case against the Department of Commerce pending before the EEOC under the Rehabilitation Act, 29 U.S.C. § 794. See Daniel Carr v. DOC, EEOC No. 430-2017-00028X.

II.

Carr asserts a Bivens claim against Gottholm, Guyton, and Hohn, in their individual and official capacities, Ross, in his official capacity, and the United States. See Compl. 23–24, 28.[3] Carr argues that Gottholm, Guyton and Hohn, knew or should have known that Carr had a property and liberty interest in his job. Compl. ¶ 50. Carr contends that by ordering JHT to remove Carr from his job in retaliation for raising occupational health and safety concerns, defendants deprived Carr of his property and liberty without due process. See id. ¶¶ 52–53. Defendants move to dismiss the claim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim [D.E. 21].

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[ ] [his]

---

[3] Gottholm was the director of the NOAA laboratory at Pivers Island. Id. ¶ 3. Guyton was the deputy director of the NOAA laboratory at Pivers Island. Id. ¶ 4. Hohn was the director of the National Marine Fisheries Service, a division of the NOAA, at the NOAA laboratory at Pivers Island. Id. ¶ 5. Ross is the Secretary of the Department of Commerce. Id ¶ 6.

5

claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

A Bivens claim is a "a judicially created damages remedy designed to vindicate violations of constitutional rights by federal actors." Hall v. Clinton, 235 F.3d 202, 204 (4th Cir. 2000); see Ziglar v. Abbasi, 137 S. Ct. 1843, 1854–56 (2017); Bivens, 403 U.S. at 395–97. In Bivens, the Supreme Court held that a Fourth Amendment violation by "a federal agent acting under color of his authority gives rise to a cause of action for damages." Bivens, 403 U.S. at 389; see Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66–67 (2001); Holly v. Scott, 434 F.3d 287, 289 (4th Cir. 2006). In finding an implied cause of action for damages, the Supreme Court held that "Congress had not foreclosed a damages remedy in 'explicit' terms and that no 'special factors' suggested that the Judiciary should 'hesitate' in the face of congressional silence." Abbasi, 137 S. Ct. at 1854 (quotations and alteration omitted); see Bivens, 403 U.S. at 396–97. The Supreme Court decided Bivens nearly four decades ago, but the Supreme Court has found an implied cause of action for damages arising from a constitutional violation in only two other cases: Davis v. Passman, 442 U.S. 228 (1979), a Fifth Amendment Due Process Clause case involving a congressional employee alleging gender discrimination, and Carlson v. Green, 446 U.S. 14 (1980), an Eighth Amendment Cruel and Unusual Punishments Clause case involving a prisoner denied adequate medical treatment. See Abbasi, 137 S. Ct. at 1854–55; Carlson, 446 U.S. at 18–23; Davis, 442 U.S. at 247–49. The Supreme Court has warned that expanding Bivens is disfavored. Abbasi, 137 S. Ct. at 1857. Moreover, since Carlson, the Supreme Court has "consistently refused to extend Bivens to any new context or new category of defendants." Id.; see Malesko, 534 U.S. at 68; Holly, 434 F.3d at 289.

Courts should be cautious before extending Bivens to "any new context or new category of defendants." Abbasi, 137 S. Ct. at 1857 (quotation omitted); see Schweiker v. Chilicky, 487 U.S.

412, 421 (1988). In assessing whether a case involves a "new context" the Supreme Court stated:

> If the case is different in a meaningful way from previous Bivens cases decided by this Court, the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusions by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Abbasi, 137 S. Ct. at 1859–60.

A court should not extend Bivens to a "new context" where special factors warrant hesitation. See id.; Hernandez v. Mesa, 137 S. Ct. 2003, 2006 (2017); Wilkie v. Robbins, 551 U.S. 537, 550 (2007). The "special factors" inquiry focuses on whether "the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Abbasi, 137 S. Ct. at 1858; see Hernandez, 137 S. Ct. at 2006; Wilkie, 551 U.S. at 550; Malesko, 534 U.S. at 68. A court should not extend Bivens to a "new context" where Congress has provided an alternative remedy, even if such remedy does not afford complete relief. See Wilkie, 551 U.S. at 550; Bush v. Lucas, 462 U.S. 367, 372–73 & n.8 (1983); Liff v. Office of Inspector Gen. for U.S. Dep't of Labor, 881 F.3d 912, 918 (D.C. Cir. 2018) (collecting cases).

As for Carr's Bivens claim against Ross, Gottholm, Guyton, and Hohn, in their official capacities, and the United States, Bivens does not permit claims against federal agencies or federal employees in their official capacity. See FDIC v. Meyer, 510 U.S. 471, 484–86 (1994); Doe v. Chao, 306 F.3d 170, 184 (4th Cir. 2002), aff'd, 540 U.S. 614 (2004). Accordingly, the court dismisses these claims.

7

As for Carr's Bivens claim against Gottholm, Guyton, and Hohn, in their individual capacities, that claim also fails. Carr's claim presents a new context from the claims presented in Bivens, Davis, and Carlson. See, e.g., Turner v. United States, —F. Supp. 3d—, 2018 WL 3233137, at *3–5 (D. Conn. July 2, 2018). In opposition to this conclusion, Carr relies on Davis, which involved an alleged violation of the Fifth Amendment Due Process Clause in the federal-employment context. Davis, however, does not extend to all cases concerning employment and the Fifth Amendment Due Process Clause. In Davis, a Congressman terminated the employment of his female administrative assistant. The former employee sued the Congressman for gender-discrimination and alleged that the Congressman told her that he needed a man to do the job. See Davis, 442 U.S. at 230. Unlike Davis, this case concerns a federal contractor and not a congressional employee. Moreover, Carr does not contend that Gottholm, Guyton, and Hohn terminated his employment. Rather, Carr contends that they directed JHT, a private entity, to terminate his employment. Furthermore, the "linchpin" of the Supreme Court's holding in Davis was that the plaintiff had no remedy for her gender-discrimination claim because Title VII did not apply to congressional employees. Gonzalez v. Velez, 864 F.3d 45, 53 (1st Cir. 2017); see Davis, 442 U.S. at 245 ("And there are available no other alternative forms of judicial relief. For Davis, as for Bivens, 'it is damages or nothing.'"). Thus, Carr's case presents a new context. See Abbasi, 137 S. Ct. at 1859–60.

As for the "special factors" analysis, special factors counseling hesitation include Congressional action and existing legislation and the existence of alternative remedies. See id. at 1858. Here, numerous factors counsel hesitation. Congress enacted OSHA, a comprehensive statutory scheme, that protects against retaliatory termination for reporting workplace safety concerns, the exact wrongdoing that Carr alleges in this case. See 29 U.S.C. § 660(c)(1); see also

8

Johnson v. Interstate Mgmt. Co., 871 F. Supp. 2d 1, 4–5 (D.D.C. 2012), aff'd, No. 14–7164, 2015 WL 4072092 (D.C. Cir. June 29, 2015) (per curiam) (unpublished). Although OSHA does not include a private right of action, OSHA authorizes the Secretary of the Department of Labor to file a civil action in a federal district court on behalf of an employee who was discharged or discriminated against for reporting a safety concern. See 29 U.S.C. § 660(c)(1); Johnson, 871 F. Supp. 2d at 4–5. In enacting OSHA, Congress intentionally declined to provide for a private right of action and instead vested the Department of Labor with the power to vindicate the rights of employees terminated in retaliation for reporting safety concerns. See, e.g., Taylor v. Brighton Corp., 616 F.2d 256, 262–63 (6th Cir. 1980). Allowing Carr to proceed with his Bivens action would, in essence, create a private right of action under OSHA when Congress expressly declined to do so. This court declines to create this "remedy in order to respect the role of Congress." Abbasi, 137 S. Ct. at 1858; see Schweiker, 487 U.S. at 423 ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional Bivens remedies."); Atterbury v. U.S. Marshals Serv., 805 F.3d 398, 404–05 (2d Cir. 2015).

Carr also has alternate remedies. The Secretary of the Department of Labor has filed an action on behalf of Carr. See Acosta v. Jardon & Howard Techs., Inc., No. 4:18-CV-16-D, [D.E. 15] (E.D.N.C. Feb. 2, 2018). The Department of Labor, on behalf of Carr, seeks reinstatement to a comparable position, back pay and benefits plus interest, punitive damages, and other relief. See id. ¶ 18. Carr also has a case against the Department of Commerce pending before the EEOC under the Rehabilitation Act, 29 U.S.C. § 794. See Daniel Carr v. DOC, EEOC No. 430-2017-00028X. If Carr succeeds in his Rehabilitation Act case, the administrative law judge can order reinstatement,

backpay, compensatory damages, and attorney's fees. See [D.E. 22] 3.

In opposition to the conclusion that Carr has alternate remedies, Carr argues that the Department of Labor's case against JHT on his behalf is not an alternate remedy because "[Carr] is not a party to that case, and has no ability to control the case or its outcome," and Guttholm, Guton, and Hohn are not parties to that case. [D.E. 24] 24. The court rejects the argument. The named plaintiff and defendant in an alternate proceeding is not relevant to assessing whether Carr's interests are protected. The remedies available to Carr through these two processes can make him whole, and are indeed greater than the remedies available under Bivens. In any event, even if the alternate remedies available to Carr would not make him whole, his claim would still fail. The inquiry focuses on whether alternate remedies are available, not whether such alternate remedies provide the same relief as a Bivens action. See Malesko, 534 U.S. at 520 ("So long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separations of powers foreclose [] judicial imposition of a new substantive liability."); Bush, 462 U.S. at 388; Liff, 881 F.3d at 918, 921. Thus, the court declines to find a Bivens cause of action and dismisses Carr's Bivens claim against Gottholm, Guyton, and Hohn, in their individual capacities.

III.

As for Carr's wrongful discharge claim against JHT, JHT argues that this court should dismiss the claim for failure to exhaust administrative remedies. See Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted); see Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 453 (4th Cir. 2012); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). "[T]he party invoking federal jurisdiction bears the burden of

10

establishing its existence." Steel Co., 523 U.S. at 104; see Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999); Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

In considering a motion to dismiss for lack of subject-matter jurisdiction, the court may consider evidence outside the pleadings without converting the motion into one for summary judgment. See, e.g., Richmond, Fredericksburg & Potomac R.R., 945 F.2d at 768. However, if a defendant "contend[s] that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," then "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982); see Kerns v. United States, 585 F.3d 187, 192–93 (4th Cir. 2009). Thus, "when a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction," a court must "assume the truthfulness of the facts alleged" in the complaint and any attached materials. Kerns, 585 F.3d at 193; see Fed. R. Civ. P. 10(c).

JHT's motion to dismiss requires the court to consider Carr's wrongful discharge claim, which arises under North Carolina law. Accordingly, the court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court "may consider lower court opinions[,] . . . treatises, and the practices of other

states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[4] In doing so, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

Under North Carolina law, an employer generally may terminate an at-will employee for any reason. Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999). North Carolina recognizes a narrow exception to that general rule if an employee's termination violates North Carolina public policy. See, e.g., Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion at 165 N.C. App. 32, 43–50, 598 S.E.2d 151, 159–63 (2004) (McCullough, J., dissenting)); Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416 S.E.2d 166, 167–70 (1992); Coman v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). To state a claim of wrongful discharge in violation of North Carolina public policy, a plaintiff must identify and rely upon a specific North Carolina statute or North Carolina constitutional provision stating North Carolina's public policy. See Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–70; Coman, 325 N.C. at 176, 381 S.E.2d at 447; Horne v. Cumberland Cty. Hosp. Sys., Inc., 228 N.C. App. 142, 146, 746 S.E.2d 13,

---

[4] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

17–19 (2013); Considine v. USA Compass Group Inc., 145 N.C. App. 314, 321–22, 551 S.E.2d 179, 184 (2001).

Carr relies on REDA, N.C. Gen. Stat. § 95-240, et seq., as a source of North Carolina's public policy. See Compl. ¶¶ 14, 56, 59, 62.[5] REDA provides a source of public policy to support a claim for wrongful discharge. See White v. Cochran, 216 N.C. App. 125, 132–33, 716 S.E.2d 420, 426–27 (2011); Whiting v. Wolfson Casing Corp., 173 N.C. App. 218, 221–22, 618 S.E.2d 750, 752–53 (2005).

JHT moves to dismiss Carr's complaint under Federal Rule of Civil Procedure 12(b)(1) because Carr has not exhausted the administrative remedies available under REDA. See [D.E. 17] 3–5. REDA prohibits retaliation against an employee when the employee "in good faith does or threatens to . . . [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action[.]" N.C. Gen. Stat. § 95-241. The aggrieved employee must file a written complaint with the North Carolina Commissioner of Labor within 180 days of the alleged violation before commencing a civil action. See id. § 95-242(a). The Commissioner of Labor will then investigate the claim and either file a civil action on behalf of the employee or issue a right-to-sue letter. See id. §§ 95-242–43. The aggrieved employee must receive a right-to-sue letter before filing a civil action under REDA. See id. § 95–243(e).

---

[5] Carr also relies on OSHA and executive orders of the President of the United States. See Compl. ¶¶ 14–15; [D.E. 23] 11–12. Carr cannot rely on a federal statute or federal public policy to support his wrongful discharge claim. See, e.g., Warren v. Smithfield Packing Co., No. 5:14–CV–71–D, 2014 WL 1691513, at *1–2 (E.D.N.C. Apr. 24, 2014) (unpublished) (collecting cases); Feldman v. Law Enf't Assocs. Corp., 779 F. Supp. 2d 472, 495–96 & n.17 (E.D.N.C. 2011). Thus, to the extent Carr bases his wrongful discharge claim on federal public policy, the court dismisses that claim for failure to state a claim.

13

Carr concedes that he has not yet received a right-to-sue letter from the North Carolina Department of Labor because the North Carolina Department of Labor deferred to the United States Department of Labor, which filed suit on behalf of Carr for a violation of OSHA. See Compl. ¶¶ 58–60. Nonetheless, Carr contends that his wrongful discharge claim is separate and distinct from his REDA claim. Thus, according to Carr, this court should not dismiss his wrongful discharge claim for failure to exhaust. See [D.E. 23] 7–13.

The court agrees. Although the Supreme Court of North Carolina has not addressed the issue, cases from the North Carolina Court of Appeals are persuasive authority. See Toloczko, 728 F.3d at 398. In Brackett v. SGL Carbon Corp., 158 N.C. App. 252, 580 S.E.2d 757 (2003), the plaintiff filed an action alleging that the defendant violated REDA. Id. at 254, 580 S.E.2d at 758. The plaintiff received a right-to-sue letter from the North Carolina Department of Labor stating that it was dismissing plaintiff's complaint due to plaintiff's failure to file his complaint within 180 days of the alleged discriminatory discharge as REDA required. Id. at 254, 580 S.E.2d at 759. The defendant moved to dismiss the REDA claim as time-barred. Id., 580 S.E.2d at 759. Before the trial court ruled on the defendant's motion, the plaintiff moved for leave to amend his complaint to add a claim for wrongful discharge in violation of North Carolina public policy and relied on REDA as the source of North Carolina public policy. Id., 580 S.E.2d at 759. The trial court granted the defendant's motion to dismiss and denied the plaintiff leave to amend to add a claim for wrongful discharge. Id. at 254–55, 580 S.E.2d at 759. On appeal, the North Carolina Court of Appeals upheld the dismissal of plaintiff's REDA claim as time-barred because the plaintiff failed to file his complaint with the North Carolina Department of Labor within 180 days of the alleged violation. Id. at 255–57, 580 S.E.2d at 759–61. Nonetheless, the Court of Appeals held that the trial court erred in denying the plaintiff leave to amend to add a claim from wrongful discharge in violation of

14

public policy based on the defendant's alleged REDA violation because REDA's 180-day statute of limitations does not apply to common law wrongful discharge claims. See id. at 258–60, 580 S.E.2d at 761–62. In reaching this conclusion, the Court of Appeals relied on REDA's text which provides that "[n]othing in this Article shall be deemed to diminish the rights or remedies of any employee under any collective bargaining agreement, employment contract, other statutory rights or remedies, or at common law." N.C. Gen. Stat. § 95-244; see Brackett, 158 N.C. App. at 260, 580 S.E.2d at 762.

Since Brackett, the North Carolina Court of Appeals has continued to apply its holding that a REDA claim is a "supplemental remedy" to a common law wrongful discharge claim with REDA as the source of North Carolina public policy. See White, 216 N.C. App. at 133, 716 S.E.2d at 426; Whiting, 173 N.C. App. at 222, 618 S.E.2d at 753. Accordingly, this court predicts that the Supreme Court of North Carolina would hold that Carr was not required to obtain a right-to-sue letter from the Department of Labor before bringing his common law wrongful discharge claim against JHT. Thus, the court grants in part and denies in part JHT's motion to dismiss.

IV.

In sum, the court GRANTS the government's motion to dismiss [D.E. 21], and GRANTS in part and DENIES in part JHT's motion to dismiss [D.E. 16].

SO ORDERED. This 17 day of October 2018.

JAMES C. DEVER III
United States District Judge

15